## THE DISTRICT COURT OF GUAM

| | |
|---|---|
| VICENTE PALACIOS CRAWFORD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ANTONIO B. WON PAT INTERNATIONAL AIRPORT AUTHORITY, GUAM; RICARDO C. DUENAS, EDDIE BAZA CALVO, and ANTHONY ADA, all in their official capacities only; and JOHN DOES 1-5,<br><br>Defendants. | CIVIL CASE NO. 15-00001<br><br><br>**DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DEFENDANT GOVERNMENT OF GUAM'S CROSS MOTION FOR SUMMARY JUDGMENT; and DEFENDANT GUAM INTERNATIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT** |

The parties have filed opposing motions for summary judgment in this case and the court heard argument on the motions on March 24, 2017. The court has now considered the motions, the supporting submissions, the arguments, and the relevant authority. The court **DENIES** Plaintiff's motion for summary judgment (ECF No. 104) and **GRANTS IN PART** Defendants' motions for summary judgment (ECF Nos. 107, 134).

## I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts for purposes of analysis of the federal claims here are undisputed. This case has old roots. In and around the time of World War II, the United States government took privately owned land on Guam for various military purposes. ECF No. 1, at ¶¶ 1, 19. Much of

1

that land was initially taken without just compensation, and some was taken without any compensation at all. ECF No. 34, at 1. Plaintiff Vicente Palacios Crawford ("Crawford") is the son of two of many landowners who had land taken during the period, although his parents received some compensation for the taking in a condemnation proceeding in 1950. ECF No. 35, Ex. 2 at 1-3. Many years later, the United States Congress recognized various properties had been taken without adequate compensation in the period and aimed to rectify the problem by establishing by statute a procedure for reimbursement of many of the dispossessed original landowners, to be administered by the District Court of Guam. ECF No. 34, at 1, 5–6. Administration of that claims procedure resulted in new payouts to many of the original landowners, including various owners who had previously received compensation, totaling tens of millions of dollars. *Id.* Crawford's parents were among those who sought and received compensation as a result of the statutory authorization and administration of the claims procedure. *Id.*

In the interim, shortly after World War II ended, Congress had enacted the Guam Land Transfer Act, which authorized the transfer of certain lands not necessary for continued military purposes to the naval government of Guam, so the naval government might transfer or sell "at its discretion" these lands to dispossessed landowners "in replacement of lands acquired for military or naval purposes." Guam Land Transfer Act, Pub. L. No. 225, 59 Stat. 584 (1945). A few years later, Congress enacted the Organic Act of Guam and created the government of Guam. Pub. L. No. 630, 64 Stat. 384 (1950). The Organic Act transferred land and other property of the naval government to the newly created government of Guam and placed various other properties, excluding certain properties reserved by the United States, under the control of the government of Guam, to be administered for the benefit of the people of Guam. ECF No. 1, ¶ 21.

The United States has over the years continued to transfer land to the government of Guam, to be administered for public benefit, as it has reduced its own needs on Guam. *Id.* ¶¶ 1, 23. In 1994, Congress enacted the Guam Excess Lands Act, which authorized a transfer of land no longer needed by the United States to the government of Guam, on the condition that Guam establish a detailed plan for use of the land for public benefit. *Id.* ¶ 31. In 2000, the United States, as part of its reduction effort, transferred to the government of Guam land in the Tiyan region of Guam—land on which the Guam International Airport Authority ("GIAA") now operates the A.B. Won Pat International Airport. *Id.* ¶ 26; ECF No. 34, at 6. The transfer imposed various restrictions; among them was a condition that the land, previously used for military airport operations and a small civilian airport, was to be used for a larger civilian airport, and any revenues generated by the airport were to be used for its maintenance and operation. ECF No. 34, at 6–7. In the event GIAA or another operator failed to meet any of the transfer restrictions, the United States retained, and still retains, the right to retake possession of the land. *Id.*

The government of Guam has at various times recognized the deleterious effects the initial takings by the United States have had on the Guam economy, and various public laws enacted in the past several decades have included express legislative findings that the takings were not, and in many cases still have not been, adequately compensated. ECF No. 1, ¶¶ 22, 30–39. In response to the enactment of the Guam Excess Lands Act and the proposed land transfer in 1994, the Guam Legislature recognized its mandate to develop a plan for public use of the lands, but nonetheless explained it would transfer the lands received back to the original landowners, having concluded they alone had "the capacity to develop these lands to their highest and best use." *Id.* ¶¶ 30–32. The Legislature reiterated the conclusion a few years later in 1997 when the United States proposed to return additional land. *Id.* ¶ 33.

The 1997 legislative response to the land transfer, however, differed from the earlier response in an important way, as the Legislature recognized the mechanism then in place for returning land to the original landowners or, in the alternative, for providing another means of compensation, had been inadequate for the task. *Id*. ¶ 36. The Legislature aimed to solve the problem by enacting the Guam Ancestral Lands Act, codified at 21 G.C.A. § 80101 *et seq*. *Id.* The Act established a Guam Ancestral Lands Commission (GALC), and it authorized the GALC to administer the provisions of the Act and to oversee the process by which original landowners, or their successors in interest, continue to seek return of their original holdings or otherwise adequate compensation. *Id*. ¶¶ 36–40; 21 G.C.A. § 80104. The Act sets forth various powers and duties for the GALC, the most prominent of which include: creation and maintenance of various land and claims registries; establishment of procedures for extinguishment of claims and awards of just compensation; and management of a trust of certain land—distinct from the land originally taken in the World War II and post-war period without adequate compensation— returned to the government of Guam, and received and managed "on behalf of ancestral landowners who, by virtue of continued government or public benefit use cannot regain possession or title to their ancestral lands." ECF No. 1, ¶ 40; 21 G.C.A. § 80104.

Counted among that group of original landowners for whom the GALC manages the trust are a group whose predecessors in interest owned land in the Tiyan area—the land where the airport now sits. ECF No. 1, ¶¶ 41, 43. Some of the original owners in the Tiyan area have had land returned, in cases where the land has not been necessary for the continued operation of the airport. *Id*. ¶¶ 47–49. Other owners, however, originally owned parcels now used by the airport, making prospects for return of their original landholdings much more unlikely. *Id*. ¶ 50.

The Guam Legislature recognized that many of the original Tiyan owners would be stuck in this way by continued operation of the airport, and the Legislature has attempted to address

the issue via various mechanisms. *Id.* In 1998, the Legislature established a "Tiyan trust," the purpose of which was to set aside income generated from land returned to Guam and not occupied by the airport to be administered for the benefit of the original Tiyan landowners who would not be returned their original holdings. *Id.* ¶ 44; Pub. L. No. 24-214 (1998). The "Tiyan trust" was never successfully implemented, however, and eventually the Legislature scrapped the plan, repealing the public law provisions which had created it. ECF No. 1, ¶¶ 45-46. A second legislative response, in 2002, required all government agencies other than the GIAA to stop using land in the Tiyan area, so some of the land might be returned to the original owners. *Id.* ¶ 47. Certain holdings were thus successfully transferred in 2004. *Id.* ¶ 48. The Legislature also recognized in 2002 that many of the original Tiyan owners could not be returned their original holdings in this way, and for them, the Legislature directed that a task force identify an "alternative means of compensation for the original owners of properties strictly needed for airport-related operations, either through leases with original landowners, outright purchase, or value-for-value land exchanges." *Id.* ¶ 50; Pub. L. No. 26-100 § 4 (2002).

The taskforce did as directed and, after negotiations with original Tiyan owners and representatives from the GALC and the GIAA, eventually proposed a size-for-size land exchange in which the original Tiyan owners would receive alternative holdings in exchange for the land retained by the GIAA for the airport. ECF No. 1, ¶ 53. Further negotiation identified two large parcels of property for the exchange, to be transferred from the trust administered by the GALC to the original Tiyan owners. *Id.* ¶¶ 57–58. In 2009, the Guam Legislature enacted a public law to effectuate the exchange, intending that the exchange would "satisfy the claims of the original and ancestral landowners of the Tiyan properties." *Id.* ¶ 60; Pub. L. 30-158 §§ 2-3. But a group of original landowners who were not to benefit from the proposed exchange— because their original holdings had been elsewhere on the island—brought a lawsuit in Guam

Superior Court to enjoin the exchange, contending the GALC trust from which the land was to be transferred had been created for the benefit of all original owners who could not be returned their original holdings, not just those in the Tiyan region. ECF No. 1, ¶¶ 61–62. The proposed transfer, the plaintiffs in that suit maintained, would thus constitute an unconstitutional taking. *Id*. The Superior Court eventually agreed, granting the non-Tiyan owners summary judgment in 2013 and permanently enjoining the proposed transfer to the original Tiyan owners. *Id*.

Searching for another solution to the problem of dispossession which continued to affect various Tiyan and non-Tiyan original owners, the Governor of Guam announced in 2014 that the GALC was prepared to disburse $3.2 million to original owners throughout Guam. *Id*. ¶ 65. The original Tiyan owners may have been slated to receive a portion these funds, in exchange for extinguishment of their claims to the land held by the GIAA in the Tiyan region. *Id*. But rulemaking and certain distribution and logistical concerns have delayed execution of this solution, although administrators continue to work on the logistics and may yet distribute all or a portion of the originally-dedicated funds. *Id*.

Crawford, a successor in interest to original Tiyan owners whose land the GIAA retains for airport use, initiated the lawsuit here on behalf of himself and a proposed class he identifies as similarly situated. *Id*. ¶¶ 67–68. He alleges this lengthy and complex history has given rise to claims of violation of the due process and equal protection clauses of the Fourteenth Amendment, as well as claims of breach of contract and unjust enrichment. *Id*. ¶¶ 76–106. Defendants filed an early motion to dismiss, raising defenses of sovereign immunity, failure to exhaust administrative remedies, and failure to state a claim, among others. ECF Nos. 32, 34. The court, noting the strict standard governing motions to dismiss, concluded Crawford had pled factual content giving rise to a reasonable inference Defendants "could be liable for the misconduct alleged" and denied the motion. ECF No. 84.

Crawford has now moved for summary judgment, contending: (1) the process Defendants have provided for resolution of certain original owner claims is constitutionally inadequate; (2) the provision of some new compensation to some original landowners coupled with the failure to provide any compensation to others violates the Fourteenth Amendment's equal protection clause; (3) the failure to provide new compensation to many of the original Tiyan landowners constitutes a breach of contract under Guam law; and (4) GIAA has been unjustly enriched as a result of the complex history here. ECF No. 104. Defendants have opposed and have moved for summary judgment on each of the claims against them. ECF Nos. 107, 134. After receiving those submissions, the court sought supplemental briefing from the parties to address various legal questions that might affect the disposition here—questions exploring whether and when it might be appropriate for a federal court to weigh in on, and grant relief with respect to, complex local problems of the kind at issue here. ECF No. 157. The parties timely responded; Crawford took the position that a federal court has jurisdiction and can and should weigh in where federal Constitutional issues arise, and Defendants did not demur, although they raised questions as to whether abstention might be appropriate, given the additional constitutional questions that might arise as a result of any relief granted in this case. ECF Nos. 159, 160, 163. The court heard argument on the summary judgment motions and supplemental briefing on March 24, 2017, and took the motions under advisement after the hearing. ECF No. 166.

## II. LEGAL STANDARD

Summary judgment is appropriate when a movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FRCP 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The standard governing a cross motion for summary judgment is the same as the standard governing motions for summary judgment—the court must consider each motion on its own merits. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Assertions by both parties that there are no genuine issues of material fact does not vitiate the court's responsibility to determine whether disputed issues of material fact are present, and summary judgment cannot be granted where a genuine issue as to any material fact exists. *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978) (per curiam).

By contrast, Rule 56 mandates entry of summary judgment against any party who, bearing the burden of proof at trial, fails to make a showing sufficient to establish the existence of an essential element of that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In that situation, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and the moving party is entitled to judgment as a matter of law. *Id.*

**III. DISCUSSION**

A point of clarification may be valuable before taking up the specific claims at issue here. Crawford has invoked the court's jurisdiction by asserting his claims arise under 42 U.S.C. § 1983, which provides for a federal forum to address many alleged deprivations of civil liberties, including deprivations occurring based on the conduct of state and local officials, and perhaps territorial officials as well—although that question has not been clearly decided by the Ninth Circuit or the United States Supreme Court. *See, e.g., Paeste v. Gov't of Guam*, 798 F.3d 1228, 1234 n.8 (9th Cir. 2015). Two propositions, however, are clear from the case law. First, section 1983 does not authorize suits against Guam or its agencies, regardless whether the suit seeks damages or prospective relief, because those defendants are not "persons" coming within the meaning of the statute. *Ngiraingas v. Sanchez*, 495 U.S. 182, 192 (1990). Second, section 1983

does not authorize suits for damages against Guam officials acting in their official capacities, "because a judgment against those defendants . . . would affect the public treasury," and the effective real party in interest would be "the Government of Guam." *Paeste*, 798 F.3d at 1235. Instead, as the court recognized in addressing Defendants' motion to dismiss, a narrow set of claims remains viable against Defendants here under section 1983—namely, portions of the claims for injunctive and declaratory relief against the named officials, to the extent the relief sought is not damages for past wrongs. *Id*. at 1236; ECF No. 84, at 10–11. The section 1983 claims of due process and equal protection violations invoking the court's jurisdiction, in other words, must be understood this precisely, and this understanding guides analysis of the claims at issue here.

### A. Due Process.

Crawford's first claim is one of violation of the Fourteenth Amendment's guarantee of due process by Defendants. Specifically, he claims that by retaining "Plaintiff's and class members' ancestral lands, the government of Guam, the GALC, and the GIAA have deprived class members of the enjoyment of their rights to their ancestral property and have continued to deprive them of the compensation they have an affirmative obligation to provide." ECF No. 1, ¶ 80. Defendants have not, Crawford contends, provided "adequate procedural protections" for dealing with the possibility of these deprivations. *Id.* ¶ 81.

As brief background, the court notes the due process clause of the Fourteenth Amendment encompasses at least three kinds of claims enforceable under section 1983: (1) claims for deprivation of rights in the Bill of Rights made applicable to the states via incorporation; (2) claims arising under the substantive component of the clause, which "bars certain arbitrary, wrongful government actions, 'regardless of the fairness of the procedures used to implement them' "; and (3) claims arising under the procedural component of the clause, which prohibits deprivation of

life, liberty, or property without application of adequate procedure. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Crawford pleads his due process claim in terms invoking only this third category and the parties have briefed and argued the claims only in those terms, and thus the court addresses the claim only in those terms. ECF No. 1, ¶¶ 81–82.

To obtain relief on a claim of violation of the procedural due process guarantee, a claimant must establish: (1) he has a liberty or property interest protected by the Constitution; (2) he has been deprived of that interest by the government or government actor; and (3) the government or government actor has granted him inadequate process in effecting the deprivation. *See Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008). The protected interest requirement has been called a "threshold requirement," in part because no deprivation can be said to have occurred if the claimant had no protected interest from the outset, and thus no process is necessary. *See Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994). Crawford argues only that he has a protected property interest here; he has made no claim of protected liberty interest. ECF No. 1, ¶¶ 80–82.

The Ninth Circuit has explained a protected property interest must arise from an independent source such as state law, and those independent laws, rules, or understandings must secure certain benefits and support claims of entitlement to those benefits. *See Gerhart v. Lake Cnty., Mont.,* 637 F.3d 1013, 1019 (9th Cir. 2011). The claim of entitlement, importantly, must be more than "abstract," and it must be substantiated by something more than "a unilateral expectation." *Id*. Instead, the claim must be "legitimate," or "reasonable,"—and the reasonableness is determined largely by the language of statute bestowing the benefit and "the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994). Statutory procedural requirements like those Crawford relies on here, the *Wedges/Ledges* court explained, will not typically transform

a unilateral expectation into a protected property interest, but they may achieve the transformation where the requirements are intended to impose significant substantive restrictions on decision-making. *Id.*

More recently examining the circumstances under which a "legitimate claim of entitlement" might arise from statutory requirements, the *Shanks* court added a limiting principle to the *Wedges/Ledges* concept of "significant substantive restriction," explaining that a statutory requirement will give rise to a constitutionally protected property interest *only* if the governing statute compels a result "upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body." *Shanks*, 540 F.3d at 1090. And even where statutory requirements confer no explicit discretion, the Ninth Circuit has explained, they cannot create a protected property interest if they leave room for the exercise of "functional" discretion—such as where a government or reviewing body retains little discretion regarding eligibility for a particular entitlement, but the nature and extent of the entitlement remain substantially indeterminate. *See Doyle v. City of Medford*, 606 F.3d 667, 675 (9th Cir. 2010).

Applying those principles to the claims here, Crawford relies on language found in three Guam Public Laws, and derivatively, in certain statutory provisions in the Guam Ancestral Lands Act, as a basis for an entitlement giving rise to a protected property interest. As a first contention, Crawford notes Guam Public Law 23-23 directed that the government of Guam "shall make good faith efforts to derive a means of compensation for continued public use of" lands that had been returned to Guam by the United States. ECF No. 1, ¶ 79. That language, he suggests, creates for him a legitimate claim of entitlement to compensation. *Id.* But the indeterminacy of the phrase "good faith efforts to derive" and the phrase "means of compensation" dispose of this specific claim of entitlement—it may well be that Crawford is presumed eligible for compensation based on the language, but whether the government will derive any means of compensation at all and

11

what the means might be are left wide open based on the language. That kind of indeterminacy, the *Doyle* court explained, counsels against a finding of legitimate expectation of entitlement. *See Doyle*, 606 F.3d at 675 ("[W]hat this requirement will yield is unpredictable in the abstract and scarcely provides an expectation of entitlement." (citation and internal quotation marks omitted)). Put another way, the language may make mandatory the use of "good faith efforts," but it makes nothing mandatory with respect to an award of, or the extent of an award of, compensation. In those circumstances, the *Wedges/Ledges* court observed, no reasonable expectation of entitlement has arisen, and thus the court cannot conclude Crawford can establish a protected property interest based on the language of Public Law 23-23. *Wedges/Ledges*, 24 F.3d at 62.

As a second contention, Crawford relies on a combination of language found in Guam Public Law 26-100, and Guam Public Law 30-06, which repealed and re-enacted the portions of Public Law 26-100 dealing with the claims of those original owners, or their successors, whose lands have been retained for airport use—a group including Crawford. Public Law 26-100 had initially directed that a task force "shall . . . find alternative means of compensation for the original owners of properties strictly needed for airport-related operations, either through leases with original landowners, outright purchases, or value-for-value land exchanges." Pub. L. 26-100. Two dispositive points may be made with respect to this Public Law 26-100 language. First, "alternative means of compensation" is again indeterminate, even when followed by the specific qualifying options the language provides, and the task force retained both significant implicit discretion and significant functional discretion based on the language as it sought an appropriate means of compensation. *See Doyle*, 606 F.3d at 675; *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 763 (2005) ("[I]ndeterminacy is not the hallmark of a duty that is mandatory. Nor can someone be safely deemed 'entitled' to something when the identity of the alleged entitlement is vague."). Second, even were that discretion significantly cabined, Crawford has not contended

the taskforce failed to carry out its mandate—as noted above and as he himself pointed out in his complaint, after consulting various stakeholders, the taskforce proposed a land-for-land exchange to satisfy any obligation it may have had given the language. ECF No. 1, ¶ 53. In other words, the Public Law 26-100 language created no legitimate expectation of entitlement for Crawford, but even if it had, he has established he was not deprived of any entitlement that might have arisen from the language.[1]

Having been presented with the taskforce land exchange proposal as a result of the Public Law 26-100 language, the Guam Legislature established a new taskforce for purposes of executing the exchange. *Id*. ¶ 54. The taskforce was created under the auspices of Public Law 30-06, which repealed the relevant provisions of Public Law 26-100, and directed this new entity to "identify the original owners of properties transferred to [GIAA]" and to "identify property of the government of Guam to be transferred to these original landowners to compensate them on a value for value and/or size for size exchange for their property that is now owned by the [airport]." Pub. L. 30-06; *see also* ECF No. ¶ 54. That language, Crawford contends, again creates a legitimate expectation of entitlement to compensation. ECF No. 1, ¶ 79. But the claim tied to this language again fails, because the language again fails to establish determinacy. Crawford may well be eligible for compensation based on the language, but whether that compensation might be based on a value-for-value exchange, or a size-for-size exchange, or some combination of the two, is given no specific directive. Questions like those, the Supreme Court has explained, must generally

---

[1] The court also notes repeal and re-enactment of the relevant Public Law 26-100 provisions in a new public law likely moots any claim of entitlement based on the old language—for any claim of legitimate expectation of entitlement, Crawford should presumably look to the new language of Public Law 30-06. *See, e.g., Billiard Table Mfg. Corp. v. First-Tyler Bank & Tr. Co.,* 16 F. Supp. 990, 993 (N.D.W. Va. 1936) ("Inchoate rights generally derived from a statute are lost by its repeal, unless saved by express words in the repealing section."); *accord Baltimore & P.R. Co. v. Grant,* 98 U.S. 398, 402 (1878) (noting where new enactment makes no reference to causes of action or cases arising under the old enactment "the presumption is always strong against continuing the old law in force for any purpose.").

be resolved before an obligation to pay—and the associated entitlement to compensation—arises. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 60–61 (1999) (highlighting statutory "reasonable" and "necessary" requirements for payment of certain medical expenses and explaining that "while [claimants] indeed have established their initial *eligibility* for medical treatment, they have yet to make good on their claim that the particular medical treatment they received was reasonable and necessary." (emphasis in original)).  Given that indeterminacy, the court cannot conclude Crawford can establish a protected property interest based on the language of Public Law 30-06.

Most important to the analysis of Crawford's claim of legitimate expectation of entitlement, however, is the statutory language setting forth the powers and duties of the GALC and the procedures by which it evaluates and responds to claims for compensation of original landowners, including Crawford and other successors in interest to the owners whose land is retained for airport purposes today.  The GALC is "directed to establish and maintain five (5) separate registries for the purposes of recording accurate information in the settlement of ancestral claims" and "shall investigate, record, file, report and respond to requests by ancestral land claimants for remedy . . . whose land was taken by the United States or by the government of Guam on or after January 1, 1930."  21 G.C.A. §§ 80104(a), (b)(1).  "Remedy," the statute provides, "includes just compensation, as defined in § 80101 . . . which for purposes of this Chapter is defined as limited to the return of land or access to landlocked lots across public lands, if public lands block access to private property."  *Id*. § 80104(b)(1).  The statute is not a model of clarity here, as the section 80101 definition, incorporated in that section 80104(b) provision, provides that "[j]ust compensation for the purposes of Chapter 80 of Title 21 . . . shall mean only land recovery or land exchange, and shall also mean any other form of compensation other than a specifically described available land."  *Id*. § 80101(k).  Based on those provisions, it appears the potential

"remedy" the GALC might investigate and record in any specific case might include any of (1) return of land; (2) exchange of land; or (3) "any other form of compensation other than a specifically described available land." *Id.*

The statute adds that the GALC "shall promulgate rules and regulations to administer the Commission's functions in a fair, just, economical and expedient way," and shall establish a specific four-step procedure for extinguishment of claims of compensation by original owners. The establishment of that procedure, the statute directs, must include an option for an owner to file a compensation application, based on which the GALC is to determine eligibility for, and the nature of, any compensation to be paid. *Id.* § 80104(c). Here the statutory language may clarify some of the confusion with respect to the nature of compensation to be paid for qualifying owners, explaining that the "[c]hapter sets forth two (2) forms of compensation for future title claims which shall be either the return of original ancestral land, or just compensation, as defined in § 80101 of this Act, based upon mutually satisfactory negotiations between the government and the applicant." *Id.* If the GALC determines various application requirements have been met, it must accept the application for title and compensation. *Id.* Whether acceptance of the application automatically triggers a conditional award of "just compensation" as contemplated by the statute is unclear, as is the related question of whether acceptance automatically triggers the provision governing extinguishment of the claim. *Id.*

More clearly, however, the statute creates a separate structure for the benefit of "ancestral landowners who, by virtue of continued government or public benefit use cannot regain possession or title to their ancestral lands," in addition to its establishment of the four-step procedure for responding to claims of compensation. *Id.* § 80104(e). The GALC, this provision directs, shall "establish a Guam-based trust" to administer various lands conveyed by the federal government to the government of Guam, shall "establish rules and regulations" for the trust, and shall use "[t]he

resulting income . . . to provide just compensation for those dispossessed ancestral landowners." *Id.*

Emerging from the language of these various provisions is the notion that the Guam Legislature intended that both the GALC and the government retain significant discretion in determining how to compensate these claims. As noted, the definitional section provides that just compensation—to be paid a class of claimants of which Crawford claims to be a member—"shall mean only land recovery or land exchange, and shall also mean any other form of compensation other than a specifically described land." *Id.* § 80101(k). Incorporating that definition, section 80104(c) adds that compensation shall be "based upon mutually satisfactory negotiations between the government" and the claimant. *Id.* § 80104(c). Those provisions add multiple layers of indeterminacy and discretion—any proposed compensation under the claims procedure must be "satisfactory" to both the government and the claimant, and compensation, for both the claims procedure and for purposes of the separate land trust managed for the benefit of dispossessed owners, might mean "any other form of compensation other than a specifically described land." *Id.*; *id.* § 80101(k). The language, in other words, can hardly be said to create an entitlement "couched in mandatory terms." *Wedges/Ledges*, 24 F.3d at 62 (quoting *Assoc. of Orange Co. Deputy Sheriffs v. Gates*, 716 F.2d 233, 734 (9th Cir. 1983)). Instead, the language leaves the decisions as to what and how much compensation to deliver "unconstrained by particularized standards or criteria," and in that scenario, the Ninth Circuit has made clear, "no entitlement exists." *Wallace v. City & Cty. of San Francisco*, 51 F.3d 284 (9th Cir. 1995).

The fact that the GALC is granted the authority to "promulgate rules and regulations to administer the Commission's functions in a fair, just, economical and expedient way," and to establish "rules and regulations" for management of the land trust adds another element of discretion largely inconsistent with the notion of legitimate expectation of entitlement. The

GALC's determinations as to what might constitute "fair, just, economical, and expedient" administration of the claims procedure and the land trust might have any number of undefined functional implications for any entitlement arising from both, as might the rules and regulations for management of the trust. That kind of functional discretion cannot be squared "with the mandatory nature of a property right." *Doyle*, 606 F.3d at 675. And to the extent Crawford ultimately contends the statutory language, and the public law language that came before, give rise to an entitlement to any *procedure* the language of each may enshrine, the Supreme Court has explained that "an entitlement to nothing but procedure" cannot "be the basis for" a claim of constitutionally protected property interest. *Town of Castle Rock,* 545 U.S. at 764.

The court recognizes the politically charged atmosphere surrounding these compensation questions, and recognizes the importance, and sensitivity, of the interests held by various stakeholders here. But given the indeterminacy and discretion inherent in the language of each of the legislative enactments to which Crawford points as the basis for his claim of legitimate expectation of entitlement, the court concludes he has not, and cannot, establish a constitutionally protected property interest for purposes of his due process claim.[2] Because Crawford cannot establish this essential element of his claim, entry of judgment as a matter of law against him on the claim is appropriate, and the court will order the claim dismissed with prejudice. *See Catrett*,

---

[2] The court notes this conclusion is at odds with the language employed in its order on Defendants' early motion to dismiss. ECF No. 84, at 15 ("Therefore, the laws of the Guam Legislature have vested an enforceable right in Plaintiff, and the court finds that Plaintiff has a protected property interest."). In any case, however, "a court may revisit prior decisions in a case and correct errors while the case is still pending." *Lahiri v. Universal Music & Video Distribution Corp*., 606 F.3d 1216, 1222 (9th Cir. 2010). Here, the court has identified this portion of its prior decision as problematic for two reasons. First, in evaluating the motion to dismiss, the court need not have concluded that any pronouncement of the Guam Legislature actually created a property interest for Crawford; instead, the court need only have concluded that the allegations in the complaint, if taken as true, stated a claim for relief plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And second, the court notes additional briefing and presentation from the parties, along with references to additional historical evidence, additional relevant statutory language, and additional relevant authority, have aided the court in more precisely identifying both the nature of Crawford's claim of entitlement here and the requisites for establishing a constitutionally protected property interest.

477 U.S. at 323.

## B. Equal Protection.

Crawford also contends Defendants have violated the equal protection clause of the Fourteenth Amendment, maintaining that all Tiyan original owners "have the same right to their ancestral lands," and certain landowners have "received full value of their ancestral land claims through the return of their property," but others, including Crawford, have yet to receive new compensation from the government for their claims. ECF No. 1, ¶ 89. Defendants' "policies and practices with respect to these claims," Crawford argues, "bear no rational relationship to a legitimate state interest." *Id.* ¶ 90.

The equal protection clause of the Fourteenth Amendment directs that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause supports claims against class-based discrimination or deprivation of fundamental rights; it also provides individual claimants relief from intentional, irrational, and differential treatment at the hands of the Government. *See, e.g., Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). This latter kind of claim, often characterized as a "class of one" claim, is analyzed under a slightly different framework than the typical class-based claim; to succeed, a claimant must establish that government actors: (1) intentionally; (2) treated the claimant differently than other similarly situated property owners; (3) without a rational basis for doing so. *See Gerhart*, 637 F.3d at 1022. The class-based claim omits the intentionality requirement, and typically asks, for a "statutory classification that neither proceeds along suspect lines nor infringes fundamental rights"—as all involved agree is the case here—whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993). The court cannot discern from the language of Crawford's complaint whether he intended to allege both class-of-one and class-

based forms of the equal protection, but given the argument made on summary judgment and given the concession he has *not* been treated uniquely here because various other Tiyan owners have received the same treatment, the court addresses only the class-based form of the claim.

With respect to the class-based claim, the court notes Crawford has not identified specific statutory language giving rise to an equal protection problem; instead, he maintains "the policies and practices" of Defendants with respect to classification of certain claims of Tiyan owners bear no rational relationship to a legitimate state interest. ECF No. 1, ¶ 90. A classification arising from a policy or practice is to be analyzed in much the same way as problematic statutory language might be; the question remains whether "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis*, 566 U.S. 673, 676 (2012); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("[A] state actor's classification comports with the Equal Protection Clause so long as it is rationally related to a legitimate state interest." (internal quotation marks omitted)). Rational basis review, the *Armour* court explained, requires "deference to reasonable underlying legislative judgments." *Armour*, 566 U.S. at 676. Where a plausible policy reason exists for the classification, any legislative facts on which the classification is based may rationally be deemed true by the governmental decisionmaker, and the relationship between classification and its goal is not so attenuated as to render the classification arbitrary or irrational, the classification is deemed constitutionally valid on rational basis review. *Id.*

Any number of justifications might constitute plausible policy reasons; among them are the promotion of public health, safety, and welfare. *Christensen v. Yolo Cty. Bd. of Sup'rs*, 995 F.2d 161, 165 (9th Cir. 1993). Alleviation of financial hardship or the risk of financial hardship imposed by external conditions, the *Christensen* court explained, may also constitute a legitimate interest. *Id.* And of course, "legislatures may implement their program step by step, in . . .

economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

Here, the record suggests various plausible policy reasons for the classification identified by Crawford, many of them economic. Retention of the airport property requires that Guam maintain the property for airport use, and requires that any revenues derived therefrom be used for capital or operating expenses. The Guam Legislature, and Defendants, may have various plausible economic and social reasons for desiring to retain the airport property and thus various economic and social reasons justifying a practice of working to establish an alternative form of compensation for those original owners with claims to the land on which the airport now sits. *Christensen*, 995 F.2d at 165 (noting classification was "adopted . . . to alleviate the financial detriment caused to the County" by adoption of a redevelopment plan); *accord Dukes*, 427 U.S. at 304 (highlighting city council's goal of avoiding "deleterious effect on the economy of the city"). Similarly, various plausible policy reasons might support a delay in establishing the nature and extent of the new compensation due these particular original owners—the form the compensation takes and the extent of the compensation might have any number of untold economic or social consequences for the landowners themselves, the local community, and the entire island. *Id.* And that Defendants have not, thus far, been able to ameliorate the perceived problem of failure to provide new compensation for some of the original owners here does not counsel against a finding of rational basis; as the *Merrifield* court explained, Defendants here may rationally defer "complete elimination of the evil to future regulations." *Merrifield*, 547 F.3d at 989 (quoting *Dukes*, 427 U.S. at 812); *see Dukes*, 427 U.S. at 305 ("This gradual approach to the problem is not constitutionally impermissible."); *accord Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 272 (1979) ("When some other independent right is not

at stake, and when there is no reason to infer antipathy, it is presumed that even improvident decisions will eventually be rectified by the democratic process[.]" (internal citations and quotation marks omitted)).

In other words, on the record here, plausible policy reasons exist for the classification, various external facts—particularly with respect to conditions on use of airport land and revenue—motivating the decision to impose a classification may rationally have been deemed true, and the relationship between the classification and its goal is not so attenuated as to render the classification arbitrary or irrational. Simply put, because Crawford cannot "negative any reasonably conceivable state of facts" that might support the classification, he cannot prevail on his equal protection claim, and the court will enter summary judgment against him and order the claim dismissed with prejudice.[3] *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001) (internal quotation marks omitted); *see also Beach Communications*, *Inc.*, 508 U.S. at 315.

## C. Supplemental Jurisdiction.

Crawford's remaining claims are claims of breach of contract and unjust enrichment—claims he concedes are strictly territorial-law claims and claims which could not be heard in federal court in the absence of the court's exercise of supplemental jurisdiction. Supplemental jurisdiction arose historically based on a recognition that "considerations of judicial economy, convenience and fairness to litigants" supported a broad power to decide various local claims in cases also presenting federal questions. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988). That recognition was to be tempered by the countervailing recognition that "in the usual

---

[3] The court recognizes this conclusion may again appear at odds with language employed in the order on Defendants' motion to dismiss. ECF No. 84, at 16 ("No rational purpose is served when some ancestral landowners receive land or compensation relatively quickly, while other ancestral landowners . . . have waited . . . ."). But for the reasons described in footnote 2, the court has identified portions of the analysis in the prior order as problematic, and has given them fuller treatment here.

case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining" the exercise of jurisdiction over remaining claims based on local law. *Id*. And similarly, the *Cohill* court recognized, considerations of economy, convenience, fairness, and comity will typically "favor a decision to relinquish jurisdiction when [local] issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Id*. But these principles do not create hard-and-fast rules to be applied inflexibly in all cases, the *Cohill* court explained, they simply provide guideposts for the court in making its decision.

The supplemental jurisdiction statute, on which Crawford initially relied to invoke the court's jurisdiction over his local claims, codifies that *Cohill* guidance and provides that "district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Ninth Circuit has noted this language is permissive—making the decision discretionary—and has explained the exercise of discretion once a section 1367 predicate is met should be informed by asking whether dismissing (or remanding, in a case initially removed) the local claims "comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." *Exec. Software N. Am., Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 24 F.3d 1545, 1557 (9th Cir. 1994) *overruled on other grounds by California Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008); *see also Acri v. Varian Assocs., Inc.,* 114 F.3d 999, 1001 (9th Cir. 1997) ("While discretion to decline to exercise supplemental jurisdiction over [local] law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the . . . values "of economy, convenience, fairness, and comity.").

Here, economy and convenience do not favor retaining jurisdiction—the contract and unjust enrichment claims give rise to various questions the court has not yet examined and which may require substantial additional analysis of both local law and history and the complex states of mind various actors have held over time. *See, e.g., Yates v. Delano Retail Partners, LLC,* 2012 WL 4944269, at *3 (N.D. Cal. Oct. 17, 2012) ("The Court has not considered the merits of the claims, and thus the interest of judicial economy does not tip the balance in favor of retaining these claims here."); *accord Shearer v. Tacoma Sch. Dist. No. 10,* 942 F. Supp. 2d 1120, 1137 (W.D. Wash. 2013) ("The [local] claims, notably those with regard to breach of contract, estoppel, and interpretation of the provisions of RCW 28A, appear to involve complex issues of [local] law, particularly in light of the facts in the record."). And comity and fairness counsel in favor of declining to exercise jurisdiction over these remaining claims; as the Supreme Court has put it, "needless decisions of [local] law should be avoided both as a matter of comity and to promote a justice between the parties, by procuring for them a surer-footed reading of applicable law." *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966); *Giordano v. City of New York*, 274 F.3d 740, 754–55 (2d Cir. 2001) ("We also see no reason to address that issue with regard to the [local] claims, lest we render a decision that does not accurately reflect New York law on the subject."). The balance of factors typically tips in favor of declining jurisdiction over local law claims in the case where all federal claims have been dismissed before trial, and Crawford has offered no persuasive reason for evaluating the balance of factors differently here.

Given that the only federal claims at issue have been dismissed before trial, and given that the balance of factors of economy, convenience, fairness, and comity does not counsel in favor of retaining jurisdiction here, the court declines to exercise jurisdiction over Crawford's remaining claims of breach of contract and unjust enrichment and will order those claims dismissed without prejudice.

## IV. CONCLUSION

As a final note, the court reiterates its recognition of the importance of the interests at stake here. Crawford's frustration is understandable. That Crawford and other Tiyan landowners have waited this long for some resolution of a process that began decades ago is troubling at best. As Crawford sums up in his own words, "[w]hile class members have endeavored to vindicate their ancestral land claims and even reached an agreement with the government of Guam that would resolve their claims, they have yet to receive any relief." ECF No. 1, ¶ 3. "Guam's procedures and the government's utilization of those procedures," he adds, "have left [him] without relief for over twelve years." ECF No. 47, at 4–5. But as has been observed in other contexts, "whether the problem of . . . delay is viewed at the level of an individual case or on a broader basis," generally "the most effective remedies for delay are available through the political process rather than through the judicial process." *See* 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 12.4, at 859 (4th ed. 2002). Parties displeased with political delay in any given case or class of cases will often achieve more success in expediting a resolution through application of political persuasion than they might through application of judicial compulsion. *Id.* Even if that political persuasion and the attendant process may move at a sometimes glacial pace, the goals at stake here are varied: timeliness, accuracy, consistency, and numerous other economic and social questions abound. Striking a balance among them is a paradigmatic policy decision—and one on which the court cannot lightly tread. *See In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (noting that in the absence of an allegation of vindictive treatment, the court had "no reason to think that judicial intervention would advance either fairness or Congress's policy objectives"). And although Crawford cannot prevail on his federal claims, the court notes Crawford's local law claims have been dismissed without prejudice so as to leave open the possibility that he may

bring them, and perhaps be awarded the relief he seeks if local law allows it, in local court. It may well be that Guam law offers him an avenue for relief that federal law, at this point, does not.

For the foregoing reasons, Crawford's motion for summary judgment (ECF No. 104) is **DENIED**. Defendants' motions for summary judgment (ECF Nos. 107, 134) are **GRANTED IN PART**; summary judgment is granted to each individual Defendant with respect to Crawford's claims arising under 42 U.S.C. § 1983. Crawford's claims arising under 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE**. Crawford's remaining local law claims are **DISMISSED WITHOUT PREJUDICE**. Because all claims have been dismissed, Crawford's motion to certify class (ECF No. 56) is **MOOT**.

       **SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
      **Chief Judge**
**Dated: Aug 30, 2017**